UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
MICHELE CALLAGHAN,                                 :

               Plaintiff,                          :          08 Civ. 03523 (SHS) (DF)

    -against-                                        :          **REPORT AND**
                                                **RECOMMENDATION**
BRAD J. JACOBS, M.D.,                              :

              Defendant.                         :
-----------------------------------------------------------X

**TO THE HONORABLE SIDNEY H. STEIN, U.S.D.J.:**

## INTRODUCTION

       This diversity action, in which plaintiff Michele Callaghan ("Plaintiff") has asserted

claims against defendant Brad J. Jacobs, M.D. ("Defendant"), for medical malpractice and lack

of informed consent, has been referred to me for the purpose of conducting a damages inquest,

following entry by the Court of a default judgment against Defendant.  (*See* Dkts. 11, 12.)  For

the reasons that follow, I recommend that Plaintiff be awarded a total of $785,000 in damages, as

she has requested.

## BACKGROUND

### A.     Factual Background

       As set out in Plaintiff's Complaint, Proposed Findings, and supporting declarations and

exhibits,[1] the events that gave rise to this action may be summarized as follows.  Plaintiff is a

resident of Massachusetts, and was born on September 2, 1965.  (Compl., at ¶ 2.)  In June, 2005,

---

     [1]*See* Complaint, dated Apr. 10, 2007 ("Compl.") (Dkt. 1); Proposed Findings of Fact and
Conclusions of Law, dated Nov. 14, 2008 ("Proposed Findings") (Dkts. 16 and 17); Affirmation
of Michael A. London, Esq. in Support of Plaintiff's Motion for Default Judgment, dated
Aug. 19, 2008 ("London Aff.").

Plaintiff learned that her silicone breast implants, which had been implanted approximately 15 years before, had ruptured, causing "silicone lumps" to form in both of her breasts. (Proposed Findings, at ¶ 1.) Once Plaintiff learned about the rupture, she consulted Defendant about replacing her old implants with new silicone implants. (*Id.* at ¶ 2.) Defendant, a resident of New York, was a licensed physician who specialized in plastic and reconstructive surgery. (Compl., at ¶¶ 3-5, 7-8; Proposed Findings, at ¶ 2.) Defendant recommended that Plaintiff undergo a procedure known as the "Bellini lift." (Proposed Findings, at ¶ 3.) He explained that, in performing the procedure, he would make incisions around each of Plaintiff's areolae, and, through those incisions, would insert new silicone implants, which would, in turn, lift Plaintiff's breasts. (*Id.*) Some time later, Plaintiff visited Defendant again and, at this time, apparently informed him that she was interested in undergoing the procedure, although, in terms of cup size, she "wanted to be a 'full C' or a 'small D.'" (*Id.* at ¶ 4.) When Plaintiff "adamantly informed" Defendant that she did not want to be a "large D," Defendant attempted to convince her otherwise. (*Id.*)

On October 11, 2005, Defendant performed breast augmentation surgery on Plaintiff. (*Id.* at ¶ 5.) Approximately one week later, Plaintiff visited Defendant for a post-operative examination. (*Id.* at ¶ 6.) During the examination, she complained that here breasts were swollen, misshapen, and bigger than a "DD" cup size. (*Id.*) She also informed Defendant that there were dark patches of skin surrounding her areolae. (*Id.*) Defendant told Plaintiff that the swelling and misshapenness was normal and that it would improve with time. (*Id.*) He also prescribed an ointment to apply to her areolae that would "aid in regrowing the dead tissue." (*Id.*) Approximately one week later, Plaintiff returned to Defendant's office for a followup

2

examination.  (*Id.* at ¶ 7.)  At this time, Defendant removed Plaintiff's sutures, although the dark patches of skin around her areolae were still present, and he cut off dead patches of skin from around Plaintiff's areolae with scissors.  (*Id.*)

After Plaintiff's sutures had been removed, she discovered that her areolae had started to separate from her breasts.  (*Id.* at ¶ 8, Ex. 1 (Photographs showing Plaintiff's wound separations).)  Plaintiff visited Defendant and showed him the separation, and Defendant advised Plaintiff to visit a wound care center.  (*Id.* at ¶ 9.)  Plaintiff thus visited and was thereafter admitted to Bay State Hospital, under the care of Dr.  Richard Brown.  (*Id.* at ¶ 10.)  At that facility, Plaintiff underwent hyperbaric chamber treatments for two hours each day, for one month.  (*Id.* at ¶ 10, Ex. 2 (Medical Records of Dr. Brown at Bay State Hospital Wound Care Center).)  As Dr. Brown had never seen anything like Plaintiff's wounds before, during one of Plaintiff's office visits, he called in Dr. Melissa Johnson, a plastic surgeon.  (*Id.* at ¶ 11, Ex. 2.)  Dr. Johnson opined that Plaintiff's areolae had separated from her breasts because the implants that Defendant had inserted were "way too big for [Plaintiff's] body," and because Defendant had "taken the sutures out way too early."  (*See id.*)

When Plaintiff finished the hyperbaric treatments, she was left with large, visible scars on both breasts.  (*Id.* at ¶ 12.)  Plaintiff then visited Defendant, who injected Plaintiff's areolae with a medication that, Defendant represented, would "flatten her scars out."  (*Id.*)  Also at this time, Plaintiff complained to Defendant that her breasts were too large, but Defendant "got annoyed and told . . . Plaintiff that the size of her breasts 'was just fine.'"  (*Id.*)  Plaintiff visited Defendant one final time on or about July 12, 2006, and again complained about the scarring and the size of her breasts.  (*Id.* at ¶ 13.)  When Plaintiff asked Defendant to take pictures of her

breasts for his file, he did so, after he ripped her gown off in front of one of his assistants.  (*See id.*)  Defendant told Plaintiff that her breasts were fine, although, when her scars healed, she should return for a "possible revision surgery."  (*See id.*)  Plaintiff left Defendant's office in tears.  (*Id.*)

In April, 2007, Plaintiff visited Dr. Johnson, seeking an opinion about her breasts, and a recommendation as to what could be done to alleviate her injuries.  (*See id.* at ¶ 14, Ex. 3 (Medical records of Dr. Johnson ("Johnson Records")).)  Dr. Johnson again expressed her opinion that the implants that Defendant had inserted in Plaintiff's body were too large, and that Defendant had removed Plaintiff's sutures too early.  (*Id.* at ¶ 14.)  Dr. Johnson believed that Plaintiff's options were limited as to what could be done, but she did recommend that Plaintiff reduce the size of her breast implants.  (*Id.*)  After her appointment with Dr. Johnson, Plaintiff scheduled another appointment with Defendant concerning her breasts and scars, but Defendant cancelled this appointment.  (*Id.* at ¶ 15.)

On or about June 18, 2007, Defendant's medical license was suspended.  (*Id.* at ¶ 16.) Defendant was charged with committing professional misconduct by (1) practicing medicine with negligence, (2) practicing medicine with gross negligence, (3) practicing medicine with gross incompetence, (4) performing professional services not authorized by the patient, and (5) engaging in conduct evidencing moral unfitness to practice medicine.  (*Id.*)  The alleged misconduct included allegations that Defendant had inserted implants that were too large for certain patients' breast pockets and had inserted implants that were larger than those his patients desired.  (*Id.*)  On September 21, 2008, Defendant admitted that he could not successfully defend

against the charges and requested permission to surrender his license.  (*See id.* at ¶ 17.) Defendant is thus no longer licensed to practice medicine in the State of New York.  (*Id.* at ¶ 18.)

In the latter part of 2008, Plaintiff consulted with another plastic surgeon, Dr. Gerald Minniti, who opined that the large size of Plaintiff's implants had suffocated the blood vessels in her breasts, thereby causing her injuries.  (*See id.* at ¶ 19, Ex. 4 (Estimate and Receipt for procedures performed by Dr. Minniti).)  Dr. Minniti recommended that Plaintiff undergo a bilateral mastopexy[2] and, to reduce the size of her implants, a reduction mammaplasty.[3]  (*Id.*) Plaintiff apparently underwent these procedures on August 21, 2008.  (*See id.*)

Plaintiff maintains that, as a result of Defendant's actions, she has sustained serious and permanent physical damage to her breasts, including separation of the peri-areolar suture line; widening and deepening of peri-areolar scars; open, draining wounds in both breasts; the need for revision surgeries; local tissue and wound necrosis; extreme peri-areolar scarring and nipple distortion; ptosis; asymmetry of the healed nipple-areolar complex bilaterally; breast pain and sensitivity; pain in the rib cage; and emotional distress.  (*See* Proposed Findings, at ¶ 24; *see also* Compl., at ¶ 13.)  Plaintiff also claims that, as a result of Defendant's negligence, she was confined to her home for some time; she was unable to pursue her usual activities; she has been

---

[2] A "mastopexy," more commonly known as a "breast lift," refers to "plastic surgery to elevate a ptotic [*i.e.*, sagging] breast in normal position, often with some improvement in shape." Mastopexy, Stedman's Medical Dictionary (Lippincott, Williams & Wilkins 27th ed.  2000) *available at* Westlaw, STEDMANS 241490.

[3] A "reduction mammaplasty" refers to "plastic surgery of the breast to reduce its size and (frequently) to improve its shape and position."  Reduction mammaplasty, Stedman's Medical Dictionary (Lippincott, Williams & Wilkins 27th ed.  2000) *available at* Westlaw, STEDMANS 239120.

compelled to submit to hospital, surgical, and medical care for her injuries; and she has incurred

losses in earnings, as well as medical expenses.  (Compl., at ¶ 13; Proposed Findings, at ¶ 24.)

     **B.**     <u>**Procedural History**</u>

     Plaintiff commenced this action on April 11, 2008 (*see* Compl.; London Aff., at ¶ 3), and

served Defendant personally on June 25, 2007 (London Aff., at ¶ 4).  On July 16, 2008, after

Defendant apparently failed to answer or move with respect to the Complaint, Plaintiff wrote to

Defendant, informing him that he was in default, and that a preliminary conference had been

scheduled before the Court on July 24, 2008.  (*Id.* at ¶ 5.)  Defendant did not respond to

Plaintiff's letter and did not serve Plaintiff with an Answer or motion papers.  (*Id.*)  Defendant

then failed to appear for the July 24, 2008, conference, which was held before Judge Stein.  (*Id.*

at ¶ 6.)  Pursuant to a discussion with Judge Stein, Plaintiff sent Defendant a second letter,

apparently informing him that he had until August 15, 2008, to file his Answer and/or move with

respect to the Complaint.  (*Id.* at ¶ 6.)

     On September 16, 2008, after Defendant had failed to comply with the August 15

deadline, Judge Stein entered a default judgment against Defendant (Dkt. 12) and referred this

matter to me for the purpose of conducting an inquest concerning Plaintiff's alleged damages

(Dkt. 11).  On September 29, 2008, I issued a Scheduling Order requiring Plaintiff to file and

serve Proposed Findings of Fact and Conclusions of Law no later than October 31, 2008.  (Dkt.

13.)  In that Order, I cautioned Defendant that if he did not respond to Plaintiff's submissions or

contact my chambers by December 1, 2008, I intended to issue a report and recommendation on

the basis of Plaintiff's written submissions alone.  (*Id.*)

On November 14, 2008, after having requested and being granted an extension, Plaintiff timely submitted her Proposed Findings.  (*See* Dkts. 15-17.)  To date, Defendant has filed no response to Plaintiff's submissions, nor has he contacted my chambers to request a hearing.  I therefore make my recommendation based solely on Plaintiff's submissions.

## DISCUSSION

## I.   APPLICABILITY OF NEW YORK LAW

At an inquest for damages following a default judgment in an ordinary diversity case, federal courts apply the law of the state in which the court is located.  *See Brinks Ltd. v. S. Afr. Airways*, 93 F.3d 1022, 1030 (2d Cir. 1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *Gottesman v. Camp N'Vei Ashdod*, No. 00 Civ. 5139 (JSM)(RLE), 2003 U.S. Dist. LEXIS 10429, at *4 (S.D.N.Y. June 11, 2003) (citing *Consorti v. Armstrong World Indus., Inc.,* 103 F.3d 2, 4 (2d Cir. 1995)) (Report & Recommendation)*, adopted by*, Order, dated July 2, 2003.  In applying the law of the forum jurisdiction, federal courts must apply that state's choice-of-law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also LNC Invs., Inc. v. First Fid. Bank, N.A.*, 935 F. Supp. 1333, 1350 (S.D.N.Y. 1996).  Accordingly, because this action was commenced in the United States District Court for the Southern District of New York, New York choice-of-law rules govern.

New York choice-of-law rules require an "interest analysis," giving controlling effect to "the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issues raised in the litigation."  *Babcock v. Jackson*, 240 N.Y.S.2d 743, 749 (1963); *see also Cooney v. Osgood Mach., Inc.*, 595 N.Y.S.2d 919, 922-23 (1993).  In this case, although Plaintiff was a Massachusetts resident, choice-of-law

7

principles point to the application of New York law, as the surgery forming the basis of this

action took place in New York, Plaintiff's injuries occurred in New York, and Defendant was, at

the time of the surgery, a licensed New York State physician. *See Babcock*, 240 N.Y.S.2d at

750-51 (noting that the state where the tort occurred has an overriding interest in regulating

conduct within its borders).

     Under New York law, the purpose of an award of damages is "to restore the injured

party, to the extent possible, to the position that would have been occupied had the wrong not

occurred." *McDougald v. Garber*, 538 N.Y.S.2d 937, 939 (1989).  Thus, in a personal injury

case, a "plaintiff is entitled to recover 'a sum of money which will justly and fairly compensate

[her] for the loss resulting from the injuries sustained.'" *Robinson v. U.S.*, 330 F. Supp. 2d 261,

290 (W.D.N.Y. 2004) (quoting *Kehrli v. City of Utica* 482 N.Y.S.2d 189 (4th Dep't 1984)).  A

"plaintiff's recovery may include compensation for his or her pain and suffering, both present

and future, impairment of physical functions or other disability, loss of time and impairment of

earning capacity; and expenses of necessary medical and hospital care and other necessary

expenses."  36 N.Y. Jur. 2d Damages § 58; *see also Ulrich v. Veterans Admin. Hosp.*, 853 F.2d

1078, 1082 (2d Cir. 1988); *McDougald*, 73 N.Y.2d at 254.

## II.    <u>PLAINTIFF'S DAMAGES</u>

### A.    <u>Medical Expenses</u>

Under New York law, a prevailing plaintiff "is entitled to recover the amount of his or

her reasonable expenditures for medicines, medical services, and attendance, including hospital

bills."  36 N.Y. Jur. 2d Damages § 92; *see also Consorti v. Armstrong World Indus.*, 9 F. Supp.

2d 307, 311 (S.D.N.Y. 1998).  Here, Plaintiff requests reimbursement of $10,000 for the cost of

her bilateral mastopexy and reduction mammaplasty, which were necessary to ease her injuries and reduce the size of her implants.  (*See* Proposed Findings, at ¶¶ 19, 25, Ex. 4.)  Plaintiff has adequately documented this expenditure (*see id*.), and I therefore recommend that she be awarded $10,000 to compensate her for these medical expenses.[4]

### B.    Pain and Suffering

While calculation of strict economic loss, such as past medical expenses, can be fairly straightforward, calculating damages for pain and suffering "is an inherently imprecise and difficult undertaking."  *Aviles v. Q.P.N. Productions, Inc.*, No. 05 Civ. 2830 (CBA)(JMA), 2006 U.S. Dist. LEXIS 63327, at *8 (E.D.N.Y. Sept. 6, 2006).  Nevertheless, it is the Court's responsibility "to ensure 'that the damage award does not exceed that which could be sustained were the case before the highest court of the state whose substantive law gives rise to the claim.'"  *Martello v. Boardwalk Enter., Inc.*, 748 F.2d 740, 750 (2nd Cir. 1984) (quoting *Hysell v. Iowa Pub. Serv. Co.*, 559 F.2d 468, 472 (8th Cir. 1977)).  Under New York law, when calculating damages for pain and suffering, awards approved in similar cases determine what is fair or reasonable compensation.  *Aviles*, 2006 U.S. Dist. Lexis 63327, at *8 (citing N.Y. C.P.L.R. § 5501(c)); *see also Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 425 (1996) ("To determine whether an award 'deviates materially from what would be reasonable compensation,' New York state courts look to awards approved in similar cases.").  In conducting inquests for damages in personal injury cases, federal courts have consistently applied this comparative approach.  *See, e.g.*, *Gottesman*, 2003 U.S. Dist. LEXIS 10429, at *7-8

---

[4] Although Plaintiff also claims lost wages as a result of being incapacitated (*see* Compl., at ¶ 13), she has made no evidentiary showing of this; I therefore recommend that she not be awarded any damages for loss of earnings.

(finding that an award of $200,000 was consistent with jury awards in other cases involving a
similarly-situated plaintiff alleging similar injuries).

Plaintiff contends that an award of $775,000 for pain and suffering would be appropriate
in this case.  (*See* Proposed Findings, at ¶ 25.)  As Plaintiff does not, however, cite damage
awards in factually similar cases, the Court, in order to identify closely analogous cases and
determine the awards made in those cases, conducted its own survey of recently reported New
York jury verdicts.  The Court's survey was not meant to be exhaustive; rather, it was meant to
set forth a basis for an informed decision as to what constitutes reasonable compensation under
the circumstances.

In its own survey, the Court restricted its search to New York State cases:  (1) decided
within approximately the last 10 years; (2) in which the plaintiff had suffered breast
disfigurement and/or areola scarring, as a result of cosmetic surgery; and (3) in which damages
were determined after trial, as opposed to in settlement.  Though many of the cases cited below
included awards for medical expenses, the Court has endeavored to review only those damages
awarded for pain and suffering.

The eight cases that the Court considered, from lowest award to highest award, include:
*Epstein v. Neumann*, No. 8951/05, 2008 WL 5274789 (N.Y. Sup. Ct. Nov. 13 2008) (awarding
plaintiff $300,000 for past pain and suffering, where plaintiff underwent a mastopexy that
resulted in breast disfigurement and scarring, but where follow up surgeries led to vast
improvements); *Gallotta v. Cinelli*, No. 115968/97, JVR No. 377143, 2000 WL 1266624
(Unspecified New York State Ct. Mar. 2000) (awarding $425,000 to plaintiff for pain and
suffering, where she brought suit against doctor after breast enlargement surgery left her with

10

severe asymmetry); *Sanchez v. Grossman*, No. 43301/01, 2008 WL 1959961 (N.Y. Sup. Ct. Mar. 11, 2008) (awarding plaintiff $450,000 for past and future pain and suffering, where, as a result of a breast reduction, plaintiff was left with unsightly scars, nipple displacement and residual emotional distress); *Carrington v. Tehrani*, No. 18884/06, 2009 WL 3863148 (N.Y. Sup. Ct. Sept. 23, 2009) (awarding plaintiff $500,000 for past pain and suffering, where plaintiff underwent breast reduction surgery, which resulted in improper nipple positioning, the need for an additional surgery, and emotional distress)[5]; *DiCicco v. Cattani*, No. 11366/03, 2007 WL 1650256, Combined Verdicts, Settlements and Expert Directories, available on LEXIS (N.Y. Sup. Ct. Apr. 5, 2007) (awarding plaintiff $700,000 for past and future pain and suffering, where plaintiff underwent breast augmentation surgery that resulted in a protruding implant and disfiguring scars and required multiple follow up surgeries); *Mitchell v. Chu*, No. 1000168/04, 2006 WL 985933 (N.Y. Sup. Ct. Jan. 27, 2006) (finding that plaintiff's damages, before reduction for comparative negligence, amounted to $780,000 for past and future pain and suffering, where plaintiff's doctor did not obtain informed consent and where surgery resulted in severe scarring and deformities on plaintiff's breasts); *Sutch v. Yarinsky*, 739 N.Y.S.2d 214 (3rd

---

[5] In *Carrington*, the jury actually awarded the plaintiff a total of $510,000, which included damages for both past pain and suffering and future medical expenses. *See id*. Although it is not entirely clear how much the jury chose to award the plaintiff for her past pain and suffering, this amount was likely $500,000, as the verdict reporter states that the plaintiff sought "recovery for her future medical expenses and $500,000 for her past pain and suffering." *See id*. Similarly, the verdict reports in *Mitchell v. Chu* and *Klein v. South Shore Cosmetic Surgeons*, both of which are discussed below (*see infra* at 11-12), do not clearly state how much the jury awarded the respective plaintiffs for their pain and suffering, as the plaintiffs in those cases sought multiple categories of damages, and the verdict reporter did not break down the total awards. That said, it seems reasonably clear from the description of those cases that the amounts the Court has listed herein constitute the sums that the jury chose to award the plaintiffs for pain and suffering.

Dep't Mar. 14, 2002) (finding that jury award of $800,000 for past and future pain and suffering was not excessive where plaintiff underwent breast reduction surgery resulting in the loss of her entire left nipple areola complex, leaving in its place a large scar and causing plaintiff to develop severe anxiety and depression); *Klein v. South Shore Cosmetic Surgeons*, No. 8847/03, 2005 WL 2043744 (N.Y. Sup. Ct. Apr. 20, 2005) (awarding plaintiff $1,060,000 for past and future pain and suffering, where plaintiff was not properly informed of the risks of her bi-lateral breast augmentation and, after multiple subsequent surgeries, was left with deformities, breast asymmetry, and extensive scarring).

Of the cases cited above, the two that appear most similar to Plaintiff's case, on their facts, are *Mitchell* and *DiCicco*. In *Mitchell*, the plaintiff underwent cosmetic surgery to correct breast asymmetry; the surgery included the insertion of one breast implant and performance of a double mastopexy. *See Mitchell,* 2006 WL 985933. The procedure failed to correct plaintiff's asymmetry, it moved and decreased the size of her nipples, it left her right breast deformed, and it resulted in excessive scarring. *Id.* The plaintiff in *Mitchell* contended that the defendant did not explain that the mastopexy would move her nipples and affect their size, and that she had thus not given him informed consent to perform the surgery. *Id.* A jury rendered a verdict in favor of the plaintiff and, before a comparative negligence reduction, awarded her $780,000 for her pain and suffering. *See id.*

In *DiCicco*, the defendant performed breast augmentation surgery on the plaintiff, and the plaintiff, thereafter, suffered complications. *See DiCicco,* 2007 WL 1650256. The defendant then replaced both of plaintiff's implants, but, soon after, plaintiff's left implant began to protrude through her skin. *Id.* After undergoing further revisionary surgeries, the plaintiff still

suffered from a misshapen breast and severe breast and areola scars.  *Id.*  Plaintiff's expert plastic surgeon opined that the defendant had not properly performed the initial surgery, which caused multiple complications and necessitated additional surgery.  *Id.*  After trial, a jury awarded the plaintiff $700,000 in past and future pain and suffering.  *Id.*

Like the plaintiffs in *Mitchell* and *DiCicco*, Plaintiff in this case has been subjected to considerable physical pain and suffering from the breast augmentation surgery performed by Defendant – both immediately after, and in the months and years following the surgery.  As in those cases, Plaintiff here suffered disfiguring breast and areola scarring, and has undergone revisionary procedures as a result.  In *DiCicco*, the plaintiff underwent multiple emergency surgeries as a result of the defendant's malpractice; here, Plaintiff underwent areolae injections (Proposed Findings, at ¶ 12), hyperbaric treatment sessions (*see id.* at ¶ 10, Ex. 2), a bilateral mastopexy, and a reduction in the size of her implants (*see id.*, at ¶ 18, Ex. 4).  Plaintiff has had to deal both physically and emotionally with the separation of her areolae from her breasts, and, as in both *Mitchell* and *DiCicco*, she states that she suffers permanent consequences, including misshapen breasts and severe scarring.  (*See*, *e.g.*, *id.* at ¶¶ 6, 8, 12, 24; *see also id*. Ex. 1.)

Further, not only do Plaintiff's injuries appear substantially equivalent to those suffered by the plaintiffs in *Mitchell* and *DiCicco*, but Defendant's conduct in this case appears similar to that of the defendants in *Mitchell* and *DiCicco*.  In *Mitchell*, for example, the defendant failed to secure the plaintiff's informed consent prior to performing the surgery, *see Mitchell*, 2006 WL 985933, and, here, Defendant not only failed to obtain Plaintiff's informed consent as to the size of her implants, but he specifically disregarded Plaintiff's instructions "that she did not want to be a 'large D.'"  (Proposed Findings, at ¶ 4; *see also id*. at ¶ 6.)  Additionally, Drs. Johnson and

Minniti both believed that Plaintiff's injuries were the result of Defendant having inserted

implants that were too large for Plaintiff's body (*see id.* at ¶¶ 11, 19), as in *DiCicco*, where the

plaintiff's injuries resulted from the defendant's having, among other things, failed to create

pockets large enough to hold the implants.  *DiCicco,* 2007 WL 1650256.

Plaintiff's proposed award of $775,000 for pain and suffering is just below the $780,000

awarded by the jury in *Mitchell* and only $75,000 higher than the $700,000 award in *DiCicco*.

Accordingly, as Plaintiff's proposal does not deviate materially from what has been found to be

reasonable compensation in factually similar cases, I recommend that Plaintiff be awarded

$775,000 for her pain and suffering.

## <u>CONCLUSION</u>

For the foregoing reasons, I recommend that judgment for Plaintiff be entered against

Defendant in the total amount of $785,000, consisting of $10,000 for Plaintiff's past medical

expenses and $775,000 for pain and suffering.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Sidney H. Stein, United States Courthouse, 500 Pearl Street, Room 1010, New York, New York,

10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street,

Room 525, New York, New York, 10007.  Any requests for an extension of time for filing

objections must be directed to Judge Stein.  FAILURE TO FILE OBJECTIONS WITHIN

14 DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE

*Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        March 5, 2010

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies To:

Hon. Sidney H. Stein, U.S.D.J.

Michael A. London, Esq.
Douglas & London
111 John Street, 14th Fl.
New York, New York 10038

Brad J. Jacobs, M.D.
134 Foxwood Drive
Jericho, New York 11753